# Exhibit B to Memorandum in Opposition
## Statement of Steven Jones

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF VIRGINIA
Richmond Division

| | | |
|---|---|---|
| In Re: | ) | |
| | ) | |
| SKS CONSTRUCTION, INC. | ) | Case No. 21-31862-KLP |
| | ) | |
| Debtor | ) | Chapter 11 |
| -------------------------------------------------- | ) | -------------------------------------------------- |
| | ) | |
| SKS CONSTRUCTION, INC. | ) | |
| | ) | |
| Plaintiff | ) | |
| v. | ) | Adversary Proceeding |
| | ) | |
| GARDNER STATION, LLC | ) | No. 21-03097-KLP |
| [by SH Partners, LLC its indemnitor] | ) | |
| | ) | |
| Respondent | ) | |
| | ) | |

**STATEMENT OF STEVEN JONES UNDER PENALTY OF PERJURY RESPECTING GARDNER STATION
<u>SITE CONTRACT PERFORMANCE OF SKS CONSTRUCTION, INC.</u>**

Steven Jones, under penalty of perjury, states as follows:

I am Steven Jones and am presently employed as VP, Leasing and Sales at the Silver Companies Fredericksburg, Virginia office. I have been involved in real estate sales and leasing in the Fredericksburg area since 1980 and have been serving in my position with the Silver Companies since October, 2014.

In 2017-2018 one of my responsibilities was sales of the Gardner Station property in Gainesville, Virginia. The idea behind Gardner Station was the purchase of property in Gainesville, Prince William County, the marketing of that property and then its development. In the case of SKS my company would sell a 1.5 acres part of the property and make a deal under which Silver would assume responsibility for development of that site and then, when the site

development was completed, turn the property over to the purchaser for building the improvements, basically what was intended to be a pre-school for the purchaser, a company known as NLD Gainesville, to lease to a school operator. Although Silver would have the responsibility for site development to the property owner, we would be hiring a contractor to do the actual site work. The site work was to be funded by depositing a portion of the sales proceeds into an escrow account controlled by Silver as seller and NLD Gainesville as purchaser. On completion of the site development the property would be turned over to the purchaser which would build the school and then lease to a company that would operate the pre-school.

We selected a site contractor known as SKS Construction. An affiliate of Silver (with some third party ownership), called Gardner Station LLC, bought and sold the property to NLD Gainesville. Jud Honaker, Silver's President for Commercial Development, knew Steven Zuchowski, a principal of SKS Construction, Inc., which was a Virginia contractor. I will defer to Jud for the full details, but he made an oral contract with Mr. Zuchowski for SKS to do the site development work for the Gardner Station Property after Gardner Station sold the property. Our project manager was Chris Hornung, who worked directly with SKS. As project manager Chris was responsible for day to day management of the project and SKS's performance of its contract, but he did not have financial or deal making authority, which was with Jud Honaker.

The Gardner Station project required my company to do the site work for the project and after completing that work turn the site over to the new owner for construction of the pre-school building that was intended to be the ultimate purpose of the overall project. NLD had made a deal with another company to lease the completed pre-school after it was completed. The deal with SKS for the sitework was for a fixed price, I recall around $946,000 and no change orders, and the time frame for doing the site work was limited, around 60 days from formal start when

2

all permits and bonds and other requirements were in place and SKS knew this. The new owner's contractor was to start its work at 75 days. When the site work was completed, the property would be turned over to the owner for actual the construction of the building. As I recall the project got going in July. We were looking for completion in early to possibly late fall.

To assure (we thought) adequate financing, the site construction was financed by an escrow fund set up by Gardner Station and NLD to hold funds from the sale of the property, which was enough to meet SKS's fixed price contact. Both Silver and NLD had to agree on disbursements. Unfortunately, there were a lot of problems in the performance of the contract and SKS did not come close to finishing its work on schedule, with complaints about their progress coming in even before September. Because of SKS delays the site was not delivered to the owner on time, so NLD lost money when it could not do its lease deal. Also, because SKS did not do its work on the agreed schedule, other contractors had to be hired to help get the project finished. SKS also had problems with paying its subcontractors.

SKS submitted its last invoice, and then signed its last lien waiver around February 8, 2018.SKS still had not finished the required site work and I do not remember their finishing their work until March or may be April. Escrow funds had to be used to pay the owner for its losses and expenses when SKS failed to perform.

The Silver Companies had their own records system, I also kept my own personal copies of records of the SKS site work at Gardner Station. When the project finally closed with the last payments to SKS and with payments to SKS and to its sub-contractors, equipment rental companies and suppliers being made in June of 2018 from the funds remining in the escrow, SKS came looking for a final payment around $145,000 on the project. This money was no longer in escrow for SKS, it was promised to cover NLD losses and expenses coming from

SKS's failure to perform. SKS had not finished the work it originally agreed to do, did not do the work it did on time and even though its delays had caused escrowed funds, planned to be paid to SKS when it properly completed its job, to be paid to cover losses and expenses caused by SKS's failure to perform, Mr. Zuchowski wanted payment in full as if his company had done its job.

Mr. Honaker and I asked Chris to write a summary about the project and SKS and its issues to use in deciding what to do. On June 20, 2018, Chris wrote a memo to Jud and me, which is attached to this statement and is labeled " Defendant's Exhibit L."

I do not recall Steve or Wendy Zuchowski ever claiming that Silver was wrong in agreeing with the property owner NLD that the escrow fund be used to pay for damages and expenses caused by SKS and its delay and work on the project, or that payments would be made to the subcontractors from the escrow account. Steve just wanted the money and expected that Silver would pay it. Jud was not willing to do this; he was willing to look into the possibility that if a good sale of part of the remaining Gardner property took place, he could see if part of the sales proceeds could be sent to Steve.
So far as I know there was no actual promise ever made to Steve to pay him any more money, or that Gardner Station or one of the Silver companies or any of the affiliates would make any payment to SKS out of their pocket.

I personally do not think SKS is entitled to any money because they did not do what they agreed to do and, for what they did, they mostly were late when they did it.

Our trial Exhibit N is a compendium of emails to which I was party that cover a wide range of issues with SKS's non-performance on the Gardner Station project.

[End of Statement]

4

Under 28 U.S.C. § 1746, I declare and certify under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

    Executed on April 13, 2022.

                                                      /s/ Steve Jones

Exhibit B to Memorandum in Opposition
Addendum to Statement of Steven Jones
June 20, 2018 Memorandum of Chris Hornung (Trial Exhibit L)



# Memorandum

**To:** Jud Honaker, Steve Jones

**CC:**

**From:** Chris Hornung, P.E.

**Date:** June 20, 2018

**Re:** Gardner Station – Everbrook Academy Delay Damage Request

---

At your request I have put together the attached development timeline (Attachment A) for the Gardner Station Everbrook Academy to identify the causes of the delays in delivery of the site to the Purchaser, NLD Gainesville, LLC ("NLD"). My understanding is that the purpose of this timeline is to provide context for consideration of NLD's request for delay damages.

### Seller's Work

The Seller's Work under the Agreement of Purchase and Sale by and between NLD and Gardner Station, LLC ("Gardner") included delivery of a graded site, construction of offsite improvements, extension of water and sewer utilities, and relocation of the overhead power lines that ran through the site. The Seller's Work and Purchaser's Work were combined into one, approved site plan designed by NLD's engineer, The Engineering Groupe ("TEG") and used by both parties for their respective work responsibilities.

### Escrow Agreement

Gardner and NLD executed an Escrow Agreement at Closing on May 3, 2017 (the "Escrow Agreement") that provided the framework for the completion and funding of Seller's Work under the terms of the Sale Agreement. $950,000 was deposited into the escrow account at closing. Paragraph 1B. of the Escrow Agreement gave the Seller seventy-five (75) days to substantially complete the Seller's Work subject to force majeure delays.

### Original Schedule

Prior to Closing, we developed a schedule with SKS Construction ("SKS") which projected pad delivery to NLD within 60 days following construction start. Completion of this work would enable NLD to begin construction of the daycare building within 75 days of construction start. We discussed this prioritization of building pad delivery with NLD at the start of construction activities, as this was the critical path for completion of their project. The remainder of the Seller's Work (sewer extension, waterline, access drive) could be completed while the NLD building was underway and would require coordination of efforts between NLD's general contractor, Black Diamond Group ("BDG"), their site contractor and SKS.



### Approvals and Bonding

A pre-construction meeting with Prince William County was held on May 15, 2017, in anticipation of starting construction shortly thereafter. However, County approval of NLD's bonds did not occur until June 16, 2017. SKS mobilized onsite on June 20, 2017 and Phase I erosion control work was completed by June 30, 2017.

### Site Design

TEG's Phase I erosion control design for the project included the construction of a sediment trap at the front left of the NLD property that was approximately 17' below the proposed building pad elevation. The sediment trap was designed to remain in place until a 36" storm sewer bypass pipe was constructed that would carry offsite runoff from Gardner's remaining property through the NLD property to a downstream receiving channel (See Attachment B). While TEG's design was a reasonable engineering approach, it did not allow SKS to adjust their grading operations on the fly to address delays caused by Virginia Power's failure to relocate its overhead facilities in a timely manner.

### Virginia Power

Prior to Closing, on April 24, 2017, Gardner paid Dominion Virginia Power ("DVP") $51,345 for the relocation of overhead power lines running through the center of the NLD property. The relocation work, along with the required new underground electric easement, was coordinated by Utility Professionals Incorporated ("UPI") and TEG to ensure it worked with NLD's site plan. I've attached a photo of the power line in question from July 2017 showing its relationship to the site for your information (Attachment C). As is evident in the Photo and Attachment B, the power line relocation was a critical path element for the project, as the poles and wires were in direct conflict with the proposed grading operation, and more significantly, the installation of the 36" storm sewer bypass pipe. Coupled with the undercut requirements discussed below, wholesale grading operations on the site would be severely hampered until the DVP lines were relocated.

We were initially given a 30-45 day completion schedule for DVP's work by UPI, subject to emergency work that DVP must regularly prioritize in response to severe weather. By June 1, DVP had not mobilized on the site. For most of June and July we were told that DVP's mobilization was imminent, but as of August 1, no work had been performed. Unable to reach anyone from DVP who could provide a definitive schedule, we contacted State Senator Richard Stuart, who contacted DVP executives about DVP's failure to perform the relocation work. DVP mobilized on August 28, and the lines were finally removed on September 22, 2017.

### Contaminated Soils

During NLD's due diligence evaluation of the Property groundwater contaminated by a petroleum product from an adjacent junkyard was identified. The contamination was identified in NLD's Phase I and Phase II ESAs and required NLD to enter into agreements with DEQ regarding site preparations to ensure that contaminants would not migrate through the ground into the daycare facility. Prior to Closing, we were informed by NLD and NLD's testing company, Terracon, that suitable onsite materials could be used for site fill provided that that top 2' of material was tested and certified by Terracon, to be clean and free of contaminants. Gardner's plan for grading the Property, which was supported by TEG's site design, was as follows:

   a) relocate the stockpile from the building pad area,

   b) reuse the portions of the stockpile that met requirements for structural fill on the Property,

   c) deposit any unsuitable materials on the balance of Gardner's property to the rear of the Property,

   d) bring in an additional 7,500 c.y. of material from an offsite source to complete the site grading.

e) fill the final 2' of the NLD site with an approved offsite material.

SKS secured an offsite source of bulk fill material in April. In June, NLD requested that we utilize surplus material from their Bristow site instead. We agreed to accept this material and directed SKS that the material would be delivered to the site. In mid-July, however, we were informed by NLD and that the Bristow material was no longer available, and that we should find another source. With their original source no longer available, SKS worked out a deal to purchase overburden from the Luck Stone quarry.

On August 16, 2017 we were notified by NLD that all soils that were not native to the Property would need to be environmentally testing and confirmed clean prior to being used within the limits of the site. This included a) any materials located in the stockpile, b) any in-situ materials on the Gardner property outside of the NLD property, and b) any imported fill material other than aggregate soils from a quarry. This was a significant departure from our original understanding. In addition, the Luck Stone overburden material was deemed unsuitable by Terracon due to chemical constituents associated with prior agricultural use of the Luck Stone property.

Then in a reversal of this August 16 direction, following meetings with their environmental consultant on August 29th, NLD notified us that:

a) The <u>onsite</u> stockpiles no longer needed to be tested before being used for fill (outside of the top 2').

b) No further testing of <u>onsite</u> materials was required.

c) Given time-constraints, the upper cap material would need to be upgraded to quarry pit fines, or other similar suitable product.

Given the continued requirement to test all offsite borrow material and the rejection of the Luck Stone overburden we had no choice but to source fill from Gardner's remaining property. In addition, we agreed to pay an additional $107,000 to import Luck Stone pit fines for the top 2' of NLD property at a cost of $107,000 to avoid time delays related to additional material testing.

**Undercut & Plan Amendments**

SKS's earthwork began in July but was limited due to:

a) the presence of the overhead DVP lines;

b) the inability to install the 36" storm bypass and therefore remove the sediment trap within the pad prism;

c) confusion over what onsite and offsite materials could be used for fill on the Property.

Terracon's testing revealed that the majority of the stockpile was unsuitable for use as fill. Once the stockpile was completely relocated onto Gardner's remaining property, Terracon determined that the materials beneath the stockpile were non-native and needed to be undercut as well to an average depth of 8-10'. This created an additional 7,500 c.y. of material that needed to be wasted on Gardner's remaining land and a need to generate an additional 7,500 c.y. of material to fill the Property. The TEG design plan did not provide sufficient space on Gardner's adjacent property to accommodate the additional waste material we had to contend with. In an attempt to maintain progress, SKS pushed the limits of the approved site plan to accommodate the additional waste material and was issued a stop work warning in early September by Prince William County. While the stop work order was characterized at the time as SKS's failure to meet County requirements, SKS made the decision to work outside the project limits of disturbance in an attempt to accelerate delivery of the NLD pad.

After meeting with the County inspectors onsite, on September 25th I notified TEG that the site plan would need to be amended to allow for additional space to waste these materials. In addition, because we no longer had an acceptable source of offsite fill, the plan would need to be modified to generate an additional

7,500 c.y. of material from our remaining property to fill the NLD pad. Along with TEG I walked this application through the review process and we received approval from Prince William County in mid-October. SKS went back to work, completed and delivered the building pad on November 2nd. Plan revisions, additional soils testing, permit fees, and additional undercut and replacement of soils increased Gardner's development costs by approximately $120,000.

**Completion of Remaining Seller's Work**

In October we offered to have NLD's contractor, Black Diamond Group (BDG) complete the remaining Seller's Work to eliminate additional conflicts between SKS and BDG and further delays to NLD's schedule. Seller's Work completed by BDG included the access drive on the left side of the NLD site, the waterline across the front of the NLD site, and several runs of storm sewer. Utilizing BDG to complete the Seller's Work increased Gardner's project costs by approximately $45,000. We accepted this increase in cost in an effort to get the project back on track for NLD.

**Sanitary Sewer**

SKS's original schedule for the offsite sanitary sewer install down Webb Drive estimated that the work would take 6 weeks to complete. With the building pad as the critical path for NLD's schedule, we directed SKS to focus efforts on the 36" storm bypass and the site grading in August and September. In October, SKS applied for permits from Prince William County Service Authority to allow for pumping sewer around the new sanitary sewer manhole on Route 29. The permit and the VDOT MOT plan approval were not issued until the end of December, and SKS's work on the sewer extension did not begin until early January. SKS encountered a significant amount of rock that could not be blasted due to its proximity to existing businesses. By February SKS was operating 2 crews working approximately 20 hours per day on the sewer install. The sewer was finally connected and approved by the PWCSA on April 13, 2018.

**NLD Delay Costs**

I have reviewed NLD's request for delay expenses resulting from the delays in starting the daycare building. I believe that most of these expenses are likely legitimate costs incurred by NLD due to delayed delivery of Seller's Work. (I have no way to verify damages charged by their tenant). However, the majority of these costs resulted from matters well beyond Gardner's reasonable control, including:

   a) DVP's failure to relocate their overhead facilities within a timely manner which prohibited Gardner from installing the 36" bypass pipe and completing the grading the NLD pad;

   b) delays caused by Terracon in providing direction for the use of onsite and offsite fill;

   c) presence of unsuitable material below stockpile elevations and a site design that didn't provide sufficient area for both a disposal site and borrow material.

More specifically, the following are my thoughts on each of the amounts requested by NLD:

**Topsoil Import** -We previously agreed to contribute $10,000 to this effort.

**NLD Sign Allowance** - We agreed to provide NLD with $14,320.88 as damages for the future relocation of the tenant's sign as a result of the sign being located within the DVP easement. However, we have since worked out a modification with DVP to relocate the DVP easement so it no longer conflicts with the sign. In addition, we have agreed to pay BDG $4,500 for the cost to relocate irrigation, remobilize for the installation of the sign, and to remove and replace landscaping. All of this work was done to ensure that the sign would not be subject to relocation in the future.

**BDG's Additional Delay Costs** - BDG's costs for winter conditions and temporary heat are the result of above-described delays in delivering the NLD building pad. Whether or not SKS's earthwork operation was inefficient up until the relocation of the power lines, the bypass pipe couldn't be installed, the sediment

trap couldn't be removed, and NLD's building pad could not be delivered until after DVP relocated their facilities, which didn't occur until September 22, 2017. From that point SKS was further delayed due to the lack of available onsite area for disposal of unsuitable material and borrow until plan revisions were approved.

BDG's generator costs are the result of delays in installing temporary electric to NLD's building which BDG has attributed to conflicts between their service route and SKS's failure to complete the 36" bypass on the right side of the Property. Gardner wasn't a party to BDG's design of the temporary electric service, as this was coordinated directly between BDG and DVP. Therefore, we could not foresee potential conflicts with this work. SKS's installation of the 36" storm bypass was further delayed by a DVP stop work order in November 2017 for unsafe conditions (potential undermining of pole) in the vicinity of DVP's poles on the right side of the Property. This conflict was created by TEG's design of the bypass which required a 20' deep excavation 20' away from a DVP pole. Neither TEG, UPI, or DVP identified this potential conflict in the review of the TEG plans or preparation of DVP's relocation design. Gardner ultimately agreed to pay DVP $16,906.42 to relocate their facilities away from the 36" bypass excavation and redesigned and permitted a modification of the 36" bypass design with Prince William County to avoid conflicts with DVP's easement (est. $4,000).

With knowledge of the November 2017 stop work order and the requirement to modify DVP's facilities as early as November, BDG could have requested an alternate service path for their temporary electric service and avoided all generator costs.

**Temporary Rest Rooms** – NLD's temporary restroom rental was a result of SKS's failure to extend the sanitary sewer to the NLD building in a timely manner. While the sewer install was hampered by rock, this should have been foreseen and better planned to meet NLD's schedule. Therefore, I believe this is damage that Gardner should pay.

### Final Thoughts

In over 20 years of overseeing development projects I have never had a project that faced more obstacles and unforeseen delays than what occurred on this project. In hindsight, there are many things that could have been done differently that may have resulted in time savings to deliver the pad more quickly to NLD. However, throughout the development process decisions were made by Gardner at great expense to Gardner to overcome these obstacles so NLD could deliver their building to their tenant.

It is my opinion that the bulk of the costs requested by NLD, other than those specifically mentioned, were caused by force majeure delays that could not have been foreseen by Gardner and are not due or collectible under the terms of the Escrow Agreement. The decision whether or not to provide additional remuneration to NLD to preserve the relationship is up to you. However, we do need the escrowed funds to be released to us as soon as possible so that we can obtain lien releases and pay contractors, subcontractors, and consultants for their work on this project.

# Gardner Station - Everbrook Initial Schedule



| ID | Task Mode | Task Name | Baseline Duration | Baseline Start | Baseline Finish | Actual Duration | Actual Start | Actual Finish |
|---|---|---|---|---|---|---|---|---|
| 1 | | Pre-Construction | 0 days? | NA | NA | 34.78 days | Mon 4/24/17 | NA |
| 2 | | DVP Deed and Payment | 0 days | Mon 4/24/17 | Mon 4/24/17 | 0 days | Mon 4/24/17 | NA |
| 3 | | Closing | 0 days | Wed 5/3/17 | Wed 5/3/17 | 0 days | NA | NA |
| 4 | | Pre-Construction Meeting | 0 days | Mon 5/15/17 | Mon 5/15/17 | 0 days | NA | NA |
| 5 | | Bond Posting Delay | 0 days | NA | NA | 20 days | Mon 5/22/17 | Fri 6/16/17 |
| 6 | | Bonds Posted | 0 days | Mon 5/22/17 | Mon 5/22/17 | 0 days | Fri 6/16/17 | Fri 6/16/17 |
| 7 | | Construction | 116 days | Tue 5/23/17 | Fri 9/15/17 | 213.72 days | Tue 6/20/17 | NA |
| 8 | | Construction Start | 1 day | Tue 5/23/17 | Tue 5/23/17 | 0 days | Tue 6/20/17 | Tue 6/20/17 |
| 9 | | Phase I Erosion | 10 days | Tue 5/23/17 | Fri 6/2/17 | 9 days | Tue 6/20/17 | Fri 6/30/17 |
| 10 | | Underground Conduit Install | 5 days | Tue 5/23/17 | Fri 5/26/17 | 4 days | Sat 6/24/17 | Wed 6/28/17 |
| 11 | | DVP Relocation Scheduling Delay | 0 days | NA | NA | 60 days | Mon 7/3/17 | Fri 9/22/17 |
| 12 | | DVP Relocation of Overhead Electric | 25 days | Tue 5/30/17 | Mon 7/3/17 | 16 days | Fri 9/1/17 | Fri 9/22/17 |
| 13 | | Clearing | 5 days | Mon 5/22/17 | Fri 5/26/17 | 5 days | Mon 7/3/17 | Fri 7/7/17 |
| 14 | | Onsite Rock Blasting | 15 days | Mon 6/5/17 | Fri 6/23/17 | 60 days | Mon 7/10/17 | Fri 9/29/17 |
| 15 | | Building Pad Grading | 20 days | Mon 7/3/17 | Fri 7/28/17 | 28 days | Mon 9/25/17 | Wed 11/1/17 |
| 16 | | Building Pad Delivery | 0 days | Mon 7/31/17 | Mon 7/31/17 | 0 days | Thu 11/2/17 | Thu 11/2/17 |
| 17 | | Plan Revision Delay - Insufficient Onsite Material | 0 days? | NA | NA | 45 days | Thu 8/31/17 | Wed 11/1/17 |
| 18 | | Daycare Site Grading | 20 days | Mon 7/3/17 | Fri 7/28/17 | 56 days | Mon 9/25/17 | Mon 12/11/17 |
| 19 | | DVP Stop Work Order Delay | 0 days | NA | NA | 52 days | Mon 12/4/17 | Tue 2/13/18 |
| 20 | | 36" Stormwater Bypass | 10 days | Mon 6/19/17 | Fri 6/30/17 | 104 days | Mon 9/25/17 | Thu 2/15/18 |
| 21 | | Sanitary Sewer Delayed by Extensive Rock | 0 days | NA | NA | 52 days | Thu 2/1/18 | Fri 4/13/18 |
| 22 | | Sanitary Sewer & Testing | 27 days | Mon 7/3/17 | Tue 8/8/17 | 89 days | Tue 12/12/17 | Fri 4/13/18 |
| 23 | | Agreed to Have Black Diamond to Complete Sitework | 0 days? | NA | NA | 0 days | NA | NA |
| 24 | | Onsite Storm Sewer | 15 days | Mon 7/31/17 | Fri 8/18/17 | 43 days | Mon 1/15/18 | Wed 3/14/18 |
| 25 | | Waterline Install | 10 days | Mon 8/14/17 | Fri 8/25/17 | 43 days | Mon 1/15/18 | Wed 3/14/18 |
| 26 | | Concrete Curb | 10 days | Mon 8/21/17 | Fri 9/1/17 | 43 days | Mon 1/15/18 | Wed 3/14/18 |
| 27 | | Road Stone & Base Paving | 15 days | Mon 8/28/17 | Fri 9/15/17 | 43 days | Mon 1/15/18 | Wed 3/14/18 |



Attachment A






11/20/17