# Exhibit C to Memorandum in Opposition
## Statement of Jud Honaker

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF VIRGINIA
Richmond Division

| | |
|---|---|
| In Re: | |
| SKS CONSTRUCTION, INC. | Case No. 21-31862-KLP |
| Debtor | Chapter 11 |
| --- | --- |
| SKS CONSTRUCTION, INC. | |
| Plaintiff | |
| v. | Adversary Proceeding |
| GARDNER STATION, LLC [by SH Partners, LLC its indemnitor] | No. 21-03097-KLP |
| Defendant | |

**STATEMENT OF B. JUDSON HONAKER UNDER PENALTY OF PERJURY RESPECTING GARDNER STATION SITE CONTRACT PERFORMANCE OF SKS CONSTRUCTION, INC.**

B. Judson Honaker, under penalty of perjury, states as follows:

I am B. Judson Honaker, known as "Jud." I am the President, Commercial Development of the Silver Companies (a trading name used to reflect a close relationship among various companies) and am in charge of the Washington D.C. Regional Office, located in Fredericksburg. I have been with the Silver Companies for more than 35 years and have always worked from Fredericksburg.

In 2016 we came up with a concept for developing a property known as Gardner Station in Gainesville, Prince William County.

In 2017-2018 one of my responsibilities was the development of the Gardner Station property in Gainesville. The idea behind Gardner Station was for an affiliate of our company to

purchase property in Gainesville, Prince William County (this was Garnder Station) and to market and sell the major part of the property. The concept was Silver would assume responsibility for site development and then, when the site development was completed, turn the property over to the purchaser for building improvements, basically what was intended to be a pre-school. The purchaser was a company known as NLD Gainesville. Silver's affiliate (Gardner Station) would have the responsibility for site development to NLD the property owner and we would hire a site contractor to do the actual site work. This site work was to be funded by depositing a portion of the sales proceeds into an escrow account controlled by Silver as seller and NLD Gainesville as purchaser and to be drawn out on agreement of both Silver and NLD. The account held enough to pay the site contractor in full if the contractor did the required work properly and timely. On completion of the site development the property would be turned over to the purchaser which would build the school and then lease it to company that would operate the pre-school.

Gardner Station was the owner of the property and the contract seller of the property but most of the work was done under my ultimate oversight through a company known as SH Partners, which agreed to indemnify the Garnder Station company against the SKS claim.

I have attached a copy of the answers to interrogatories given to us by SKS. Basically, Steve Zuchowski, who had a company called SKS Construction, and I had known each other for many years. When Steve heard about our project he came by my house to make a pitch for me to hire his company to do the site development work. Because I had experienced projects where Steve got the work by being the low bidder and then submitted many change orders bringing the price up, I had not been doing as much with him as I used to. I said I would consider SKS as site contractor, but the contract had to be a fixed price/unclassified/no change order deal with strict

compliance with NLD's scheduling requirements. He agreed. He linked up with Chris Horning as our project manager and the price was fixed at about $946,000.00 with the fixed price/unclassified/no change order basis with strict compliance with scheduling requirements an essential part of the deal for us as the party promising to get the site work done. The scope of work is in my interrogatory answer. This was an oral contract.

SKS from shortly after the beginning was behind on the construction schedule and we began to get letters from the NLD people about SKS's slow progress. Things went from bad to worse and in February, 2018 SKS put in its final request for payment. Our trial exhibits show they breached the contract by asking for change orders contrary to our agreement, by not following the required schedules, by delaying and doing unacceptable work that caused us to have to use escrow account money to cover for damages caused by SKS instead of paying SKS if SKS had done what it was supposed to have done. Our trial exhibit I deals with the final pay application from SKS, shows SKS's final lien waiver dated February 8, 2018, which led eventually to the close out of the escrow account in the early summer. By my June 26, 2018 letter to the Property Owner (attached trial Exhibit M) I asked to close out the Escrow account (both of us had to agree to any withdrawals for the escrow). With the money from the escrow account dedicated almost entirely to paying the damages suffered by NLD because SKS did not timely perform (they were months behind) or do all that they were supposed to do or in the way they were supposed to do it, and especially paying their suppliers, sub-contractors and equipment rental companies, SKS itself got very little out of the final payout. SKS then started trying to collect around $145,000 they had not earned because they did not do the work they were supposed to do or at the time they were supposed to do it. The work on the project did not finish up until March or April, but Mr. Zuchowski wanted to be paid on the basis of this last lien

waiver and pay app, February 8, 2018 (in our trial Exhibit I) and he kept asking for the $145,000 even though the money was gone to cover the losses SKS caused and had not earned.

Our company CFO went over the figures in our trial Exhibit B. We approved two of the change orders even though we had no legal obligation to do this because it became obvious to me that SKS did not have the money to pay its suppliers and subs and that if we did not agree to pay money to SKS by accepting these change orders (even though SKS was breaching the contract by asking), the entire project might collapse, leading to large damages. We had to pay $100,000 to NLD for the loss they took when SKS did not do their work on the agreed schedule and caused NLD to lose a lease that would have paid them that money if they had been able to deliver the lease. No properly completed site work meant no building and no building meant no lease. We had to pay money to Dominion Energy and to replace faulty sewer work. So, our CFO assumed that even if SKS had done its work and been entitled to the $144,000 or so they requested (which SKS was not entitled to), all of that money had to go to pay for the damages caused by SKS when it did not do its work timely or properly. We did not pay SKS any more money because we did not owe it.

I did tell Steve Zuchowski I would try to do one thing for him. Gardner Station still owned some property in the Gainesville area after the project with SKS had ended I told Steve Zuchowski at a meeting if we were able to sell some of the remaining property at a good price and if the partnership agreed, I would try to see if I could get him paid some of the sales proceeds. But that did not happen. I never promised to pay SKS anything more than what they actually had been paid and we did not owe them anything more.

Chris Hornung, who was our project officer but left our company shortly after the project ended, provided our lawyer with a memorandum he wrote to me and Steve Jones about the issues

4

we had with SKS and its contract shortfalls and failures. That is our Trial Exhibit L. Chris also sent an email to Steve Zuchowski passing on the discussion we all had had about the possibility of getting some money for Steve if some possible land sales came through and the partnership agreed, but I never promised to pay Steve anything more. I am pretty sure Chris never made any payment process, either promise, but if he did Steve knew that I had that authority (that is why he asked me for the work), not Chris, and I never promised to pay SKS anything more after we closed the escrow account.

Exhibits:   Answers to Interrogatories
Exhibit B – CFO arithmetic showing money paid out because of SKS breach of contract.
Exhibit I – SKS Feb 8, 2018 Final lien Waiver and subcontractor Releases
Exhibit L - June 20, 2018 C. Hornung Memo to J Honaker and S Jones on Delays and Damages
Exhibit M – My June 26 letter on closing the escrow account

[End of Statement]

Under 28 U.S.C. § 1746, I declare and certify under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

Executed on April 13, 2022.

_____
B. Judson Honaker

5

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF VIRGINIA
Richmond Division

| | | |
|---|---|---|
| In Re: | ) | |
| | ) | |
| SKS CONSTRUCTION, INC. | ) | Case No. 21-31862-KLP |
| | ) | |
| Debtor | ) | Chapter 11 |
| --------------------------------------------- | ) | -------------------------------------------- |
| | ) | |
| SKS CONSTRUCTION, INC. | ) | |
| | ) | |
| | ) | |
| | ) | |
| Plaintiff | ) | |
| v. | ) | Adversary Proceeding |
| | ) | |
| GARDNER STATION, LLC | ) | No. 21-03097-KLP |
| | ) | |
| Defendant | ) | |
| | ) | |

## RESPONSE TO FIRST DISCOVERY OF SKS CONSTRUCTION

Gardner Station, LLC, by its indemnitor SH Partners, LLC, ("Defendant") responds to the First Discovery of SKS Construction, Inc. ("Plaintiff"), and says:

Answers to Interrogatories

1. Identify all individuals who supplied information to produce the answers to these Interrogatories, and state the nature of the information provided by each individual.

Answer: B. Judson Honaker, President, Commercial Development Silver Companies Regional Office, Metro Washington, D.B. and Steve Jones, VP, Leasing and Sales, Silver Companies Regional Office. Billie Dove, administrative assistant for Silver Companies, provided some of the information provided in answering these interrogatories to Messrs. Honaker and Jones.

Messrs. Honaker and Jones collaborated on all points in providing these interrogatory answers and since and the Defendant cannot identify a single source for this information.

Mr. Honaker acted as President of SH Partners LLC, Indemnitor to defendant Gardner Station, LLC throughout the project and Mr. Jones was also involved as a representative on the project. Mr. Chris Hornung, a former Siler employee, was project manager for SH Partners

2. State all terms, including price(s), timing, and scope of work, which you contend constitute the agreement or contract between the parties, as referenced in ¶ 16 of your Answer.

Answer:

There was no written contract between the parties.

There was an oral version of the equivalent of a letter of intent when (date not recalled). S H Partners through Mr. Honaker was planning for the development of property known as Gardner Station located in Gainesville, Virginia into a day care/pre-school facility. Steve Zuchowski of SKS had done site construction work for projects developed by Mr. Honaker before, but increasing problems with projects where SKS had been site contractor (low initial bids to get the contract, then followed by many requests for change orders increasing the price), resulted in Mr. Honaker reducing his business with SKS. When Mr. Zuchowski heard about the Gardner project he personally visited Mr. Honaker at Mr. Honaker's home and vigorously pursued the site work. Mr. Honaker told Mr. Zuchowski he would consider SKS, but the contract had to be on a fixed price/unclassified/no change order basis with strict compliance with scheduling requirements because that was an essential part of the deal for SH. Mr. Zuchowski agreed.

Mr. Zuchowski subsequently was told he was awarded the site work for the Garnder station project by communication from Chris Hornung around May 4, 2017. Shortly after that

date Mr. Zuchowski was in contact with Prince William County officials to discuss the project. Mr. Zuchowski was aware of the property on which the work was to be done when he met with Mr. Honaker at Mr. Honaker's residence and had ample time to inspect the property site to determine all pricing issues for the contract. Mr. Zuchowski was told the work would need to done on a time essential basis as SH was under contract with a third party, NLD Gainesville, LLC, as the owner of the project site on which SKS was to be site contractor and the work had to be done compliant with NLD's schedule. At the time of contract award to SKS, SH did not know of an outside completion date but estimated this as September, 2017 – basically a summer's work. SKS accepted the work on a time critical basis, with work to begin as soon as possible and to begin work as soon as possible and agreed to deliver the site with all site work completed as soon as possible but no later than September, The parties agreed to a fixed price of $946,225.00 for the site contractor work.

Scope of work was:

(i) site level graded with buildable soils and all structures and vegetation removed with grading as shown on Seller's site plan; (ii) all access points (to public and private streets) shown on Seller's site plan for Purchaser's intended use as a child day care center (the "Intended Use"), are constructed; (iii) any offsite improvements (such as sidewalks, landscaping, etc.) are constructed as required by municipal authorities as a condition to issuance of a certificate of occupancy for Purchaser's Intended Use; provided however, that Purchaser shall be responsible for sidewalks and landscaping along Nolan Road; (iv) and any shared storm water detention or retention systems are sized adequately and extended to the Property's boundaries for Purchaser's Intended Use; (v) sanitary and water sized for Purchaser's Intended Use and extended to within 5' of the Property boundary; (vi) any work required by any governmental authority to the existing water draining facility; (vii) Seller will provide to Purchaser any and all engineering and site compaction reports for the Property in sufficient quantity and detail to ensure the appropriate fill and compaction of the soil material; and (viii) relocation of the existing overhead power line along Nolan Road underground with the exception of one terminal pole on the Property; which will not interfere with construction or operation of Purchaser's planned building. Purchaser shall have the right, at Purchaser's sole cost and expense, to inspect any of Seller's Work outlined in this section during or after completion of such work. All utility availability service and tap fees shall be the responsibility of the Purchaser. Purchaser shall grant any and all easements to Seller and its designees reasonably required in order for Seller to complete Seller's Work, such obligation to survive Settlement. Notwithstanding anything herein to the contrary, Seller will commence Seller's Work as soon as reasonably practical (but not later than fifteen (15) days) after receipt of

such permit to complete Seller's Work and complete such work within forty-five (45) days. The parties will work together using The Engineering Groupe, Inc. as the civil engineer to apply for and complete the plans for Seller's Work and Buyer's Intended Use for submittal to the County for approval as quickly and as reasonably possible. It is understood by the parties that time is of the essence for Seller's Work to be completed.

Since this was an oral contract there may have been other informal and minor terms that did not change any of the above principal points.

3. If you contend that SKS breached, defaulted, violated, or otherwise failed to perform any of its obligations under the agreement or contract specified in the prior Interrogatory (including, without limitation, in relation to your contentions in ¶¶ 27-28 of your Answer), state with specificity the nature of all such alleged breaches, defaults, or failures to perform, the date(s) on which they occurred, and specify the damages (if any) which you contend resulted from each such breach, default, or failure to perform. Include in your Answer the date on which you discovered the basis for your contention as to each such breach, default, violation, or failure to perform.

Answer: Plaintiff did breach its contract. Its progress in the summer of 2017 was very slow and caused concern with S H Partners and with NLD. This led to a warning letter from NLD on August 18, 2017, followed by a default notice email on September 7, followed by a September 12, 2017 letter from the property purchaser with a proposal on curing site contract failures to proceed satisfactorily, followed by a September 26 letter also on unsatisfactory site progress, followed by a formal default letter on November 10. This trend of delay continued with a December 27, 2017 email from SKS with a proposed time line for sewer install and a time line for the project; even as of the end of 2017 SKS had not finished its work and it still remained uncompleted on February 7, 2018 when the contract purchaser again noted lack of site progress

4

more than 4 months after the site work was to have been completed. So, SKS was in continued default from no later than September 30, 2017 for the remainder of the contract. SKS also breached the fixed price/no change order agreement terms under which it was awarded the contract in submitted without prior waiver of this agreement some four change orders, with camouflage names such as "Work Order," then "Proposed Work Worder," then, finally, "Change Order." S H Partners was required to write two party checks to pay some $400,000 in payments because of SKS's failures to pay its invoices. SKS was paid directly over $440,000. SKS's extraordinary failure in its failure to accomplish its work timely led directly to S H Partners paying delay damages to NLD Gainesville, the property purchaser, $100,000 for losses incurred by the delay plus another $33,000 for faulty sewer replacement work by SKS, plus $13,000 to Dominion Energy for SKS failures.

The original fixed price contract of $946,225 ended up with S H overpaying SKS by $1,990.43.

SKS was the first to breach, by not later than September 30, 2017, and thus is not entitled to any payment as the alleged breach by S H Partners

4. Identify and describe with specificity all setoffs, including the source, nature, and amount(s) of such setoffs, to which you claim to be entitled with respect to this case, as alleged in ¶ 26 of your Answer, including the date on which you discovered the basis for each such setoff.

Answer: Please see documents posted to Microsoft One Drive. Reference is made to all of these documents under Rule 9033, but accountings are highlighted for convenience with X- as a prefix.

5

However, Plaintiff should refer to all documents produced and the prefix of "X-" is provided only as a convenience.

5. State the amount, if any, which you contend was still due and owing by you to SKS as of May 1, 2018 on account of work performed by SKS at the Gardner Station project, <u>without regard to or deduction of</u> any alleged setoffs, recoupments, or other defenses or counterclaims.

Answer: Nothing at all. The defendant sued by SKS is Gardner Station, LLC, but SKS Construction had no construction contract with Gardner and the amount owed by Gardner to SKS, S H Partners having agreed to indemnify Gardner, is $0.00. SKS knew it had a construction contract with S H Partners and sent all of its payment draws to "Silver Companies" (S H Partners is one of the "Silver Companies"). Mr. Zuchowski met with Mr. Honaker, who is well known to be affiliated with the Silver Companies and his last name, Honaker, provides the "H" in S H Partners LLC. SKS, to the knowledge of S H Partners, NEVER sent any invoices to Gardner Station for site work and the complaint reflects no allegation that any of the "Silver Companies," and particularly S H Partners, had a construction contract with the Plaintiff.

Reserving this point, if SKS had sued S H Partners, then, accepting for argument's sake only and given the way this interrogatory is phrased, while the response is grossly inaccurate as a measure of a proper sum due, the arithmetic is simple: $946,225 fixed original price, less payments to SKS or to its vendors in the sum of $847,845, results in a figure of $98,380. This is a legally improper number because it requires ignoring the numerous defaults and delays of SKS and monies S H Partners had to pay out because of SKS failures to perform but we are answering your interrogatory as you have phrased it.

GARDNER STATION, LLC
by and through its Indemnitor SH Partners, LLC

By: _____
Title: Authorized Representative
Printed Name: B. Judson Honaker

**UNSWORN DECLARATION UNDER PENALTY OF PERJURY**

1. I am B. Judson Honaker, authorized representative of SH Partners, LLC

2. The answers to the above interrogatories are true to the best of my knowledge.

Under 28 U.S.C. § 1746, I declare and certify under penalty of perjury that the foregoing is true and correct.

Dated: March 10, 2022

Signature: _____

7

Exhibit to Jud Honaker Statement
Defense Exhibit B for Trial (Financial Review of Contract)

## Gardner Daycare Financial Review

| Vendor | Total Paid |
|---|---:|
| **SKS Reconciliation** | |
| Original cost estimate | 984,679.00 |
| | |
| Change orders: | |
|   2018-100 VDOT overlay (required by VDOT) | 14,427.00 |
|   2018-101 Hydro Seeding (per Chris) | 3,440.00 |
|   Total | 17,867.00 |
| | |
| Revised estimate | 1,002,546.00 |
| | |
| Paid to date: | |
|   Paid to SKS | 535,567.00 |
|   Invoice from SKS chargeable to tenant | 10,150.00 |
|   Payments made to vendors 06/25/2018 | 192,085.54 |
|   Payments made to Vendors 07/25/2018 | 120,192.91 |
|   Total Payments made to Vendors | 857,995.45 |
| | |
| Net Due to SKS before Adjustments | 144,550.55 |
| | |
| Adjustments for Penalties & Repairs: | |
|   Penalties to Tenant: | |
|     NLD Gainesville | 50,000.00 |
|     NLD Gainesville #2 | 50,000.00 |
|     Total | 100,000.00 |
| | |
|   Payments Due: | |
|     Hydro Seeding (per Steve) | 2,000.00 |
|     Invoice #18211475CATHER4 Dominion Energy | 13,049.32 |
|     Failed inspection storm sewer replacement | 33,491.66 |
|     Total | 46,540.98 |
| | |
| Total Adjustments | 146,540.98 |
| | |
| Net Overpayment to SKS | (1,990.43) |
| | |
| **SKS Invoices Billed - Not Approved** | |
|   CO#1 undercuts | 35,442.00 |
|   Co#2 Import fill/replace bad dirt | 47,415.00 |
|   2018-102 Interest charges incurred by SKS | 29,079.04 |
|   Total | 111,936.04 |



DEFENDANT'S EXHIBIT B

## Gardner Daycare Financial Review

| Vendor | Total Paid | |
|---|---|---|
| **Late Fees paid to Tenant:** | | |
| NLD Gainesville | 50,000.00 | |
| NLD Gainesville #2 | 50,000.00 | |
| Total | 100,000.00 | 100,000.00 |
| | | |
| Total Expenditures | | 1,562,353.28 |
| Sales Price | | 1,525,000.00 |
| Loss to Date | | (37,353.28) |
| | | |
| **A/P:** | | |
| Dominion Energy | 13,049.32 | damages |
| Black Diamond | 33,491.66 | storm sewer repair |
| Black Diamond | 2,000.00 | hydroseeding |
| Total | 48,540.98 | 48,540.98 |
| | | |
| **Total Projected Loss** | | (85,894.26) |

# FINAL WAIVER AND RELEASE OF LIENS

The undersigned is a general contractor or subcontractor, materialman or other person furnishing services or labor or material in the construction or repair of improvements upon real estate owned by Gardner Station, LLC and described as follows:

<u>Gardner Station Day Care Center</u>

In consideration of the sum of $55,120.16 to the undersigned in hand paid, receipt whereof is hereby acknowledged, and other benefits accruing, the undersigned does hereby waive, release and quitclaim in favor of the owner or owners of said real estate and in favor of each and every party making a loan on said real estate, as improved and his or its successors and assigns, all right that the undersigned may have to a lien upon the land and improvements above described.

IT IS UNDERSTOOD AND AGREED THAT THIS WAIVER AND RELEASE IS FOR ALL SERVICES RENDERED, WORK DONE AND MATERIAL FURNISHED PRIOR TO THE DATE HEREOF and is for all such services rendered, work done and material furnished and not only for the particular item indicated below.

Witness the following signature and seal this __9__ day of __February__, __2018__.

Firm: __SKS Construction, Inc.__

By: _[signature]_

Invoice No. __2/2/18__

Title: _[signature]_

Amount $ __55,120.16__

Social Security #: _____

P.O. No. _____

Or Fed. Tax ID#: _____

(Services, labor or material Furnished)

Subscribed and sworn to before the undersigned, a Notary Public for the City of Fredericksburg, State of Virginia, in said City, this __9__ day of __February__, __2018__.

_Billie B. Dove_
Notary Public

_I was commissioned_
_Notary Public as Billie B. Davis_

My Commission expires: __February 28, 2019__

[Notary Seal: BILLIE B. DAVIS, NOTARY PUBLIC, COMMONWEALTH OF VIRGINIA, MY COMMISSION NUMBER 200891]



# Memorandum

**To:** Jud Honaker, Steve Jones

**CC:**

**From:** Chris Hornung, P.E.

**Date:** June 20, 2018

**Re:** Gardner Station – Everbrook Academy Delay Damage Request

---

At your request I have put together the attached development timeline (Attachment A) for the Gardner Station Everbrook Academy to identify the causes of the delays in delivery of the site to the Purchaser, NLD Gainesville, LLC ("NLD"). My understanding is that the purpose of this timeline is to provide context for consideration of NLD's request for delay damages.

<u>Seller's Work</u>

The Seller's Work under the Agreement of Purchase and Sale by and between NLD and Gardner Station, LLC ("Gardner") included delivery of a graded site, construction of offsite improvements, extension of water and sewer utilities, and relocation of the overhead power lines that ran through the site. The Seller's Work and Purchaser's Work were combined into one, approved site plan designed by NLD's engineer, The Engineering Groupe ("TEG") and used by both parties for their respective work responsibilities.

<u>Escrow Agreement</u>

Gardner and NLD executed an Escrow Agreement at Closing on May 3, 2017 (the "Escrow Agreement") that provided the framework for the completion and funding of Seller's Work under the terms of the Sale Agreement. $950,000 was deposited into the escrow account at closing. Paragraph 1B. of the Escrow Agreement gave the Seller seventy-five (75) days to substantially complete the Seller's Work subject to force majeure delays.

<u>Original Schedule</u>

Prior to Closing, we developed a schedule with SKS Construction ("SKS") which projected pad delivery to NLD within 60 days following construction start. Completion of this work would enable NLD to begin construction of the daycare building within 75 days of construction start. We discussed this prioritization of building pad delivery with NLD at the start of construction activities, as this was the critical path for completion of their project. The remainder of the Seller's Work (sewer extension, waterline, access drive) could be completed while the NLD building was underway and would require coordination of efforts between NLD's general contractor, Black Diamond Group ("BDG"), their site contractor and SKS.





June 26, 2018

Fidelity National Title Insurance Company

804 Charles Street

Fredericksburg, VA 22401

Dear Ms. McManama,

In accordance with the terms of the escrow agreement dated May 3, 2017 between FIDELITY NATIONAL TITLE INSURANCE COMPANY (Escrow Agent), Gardner Station, LLC, a Virginia limited liability company, ("Seller"), and NLD Gainesville, a Virginia limited liability company, ("Purchaser"), please release the remaining $420,340.12 from this account.

| $50,000 needs to be released to: | $370.340.12 needs to be released to: |
|---|---|
| NLD Gainesville, LLC | Gardner Station, LLC |
| Attn: Karla A. Carlson | Attn: Leissa Richardson |
| c/o Capital Real Estate, Inc | 1201 Central Park Blvd |
| 50 South Sixth St., Ste 1480 | Fredericksburg, VA 22401 |
| Minneapolis, MN 55402 | |

A letter has been sent to Karla R. Carlson at NLD Gainesville, LLC notifying her of this release request.

Thank you for your assistance.

Sincerely,

B. Judson Honaker, Jr.

BOCA RATON OFFICES
1001 EAST TELECOM DRIVE, BOCA RATON, FL 33431
PH: 561.981.5252  FX: 561.981.5253

METRO WASHINGTON, D.C. OFFICES
1201 CENTRAL PARK BLVD., FREDERICKSBURG, VA 22401
PH: 540.786.1400  FX: 540.786.6455

